Filed 3/6/26  In re James A. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JAMES A., a Person Coming Under Juvenile Court Law. | B347007<br><br>(Los Angeles County Super. Ct. No. 20CCJP01642) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEPHANIE R.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lucia J. Murillo, Judge Pro Tempore.  Affirmed.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant-mother Stephanie R. appeals from juvenile court orders: (1) sustaining a petition filed by the Los Angeles Department of Children and Family Services (DCFS) under Welfare and Institutions Code section 300 on behalf of Mother's son James (born July 2023); and (2) removing James from her.[1] Mother argues substantial evidence does not support the court's jurisdictional findings, and its dispositional order must therefore be reversed as well. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Prior Child Welfare History*

#### 1. Des.R. and Del.R.

In April 2009, two of Mother's children—Des.R. (three years old) and Del.R. (less than three months old)—were detained from Mother when she and her "male companion" were arrested "for felony spousal abuse in the presence of the children." Mother failed to reunify with these children and, in April 2012, their foster parents adopted them.

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

## 2. Ani.S., Ala.S., Amb.S., and Abr.S.

In January 2016, an unknown person reported Mother to DCFS for general neglect. Among the allegations were that her house smelled of marijuana, and that "the mother" was under the influence of marijuana.[2] The referral stated: "No marijuana was found in the home, but a bong was found in the mother's bedroom as well as a weed pipe in the hallway. . . . Reportedly, there was a scale with white residue," that someone claimed to be methamphetamine. The referral also claimed, "Mother Stephanie R[]." knew about the scale and that "the mother" admitted to using marijuana, but not in the presence of her children. The children were still at home with "the mother" because she "was not under the influence." The referral was substantiated.

In July 2016, the juvenile court sustained a May 2016 petition (presumably filed due to the substantiated referral discussed in the previous paragraph) as to Ani.S. (three years old), Ala.S. (two years old), and Amb.S. (one year old), finding Mother and the children's father (Anthony S.) "placed the children in a detrimental and endangering situation" because "a drug pipe and methamphetamine residue were found in the children's home, within access to the children and the parents allowed drug use in the home." There was also "a strong odor of marijuana in the home." The court found Mother and Anthony S. "have a history of engaging in violent altercations in the presence of the children." The court permitted the children to live with

---

[2] It is unclear if the "mother" mentioned in the referral is the same person as Mother, as the referral also mentioned the smell of marijuana was "strongest in Mother Gloria G[.]'s room."

Mother, provided she resided at "Stepping Stones."[3]  In December 2016, the juvenile court sustained an October 2016 petition as to Abr.S. (one week old) on the grounds that Mother and Anthony S. had endangered the newborn's siblings.  The newborn was placed in Mother's care under DCFS supervision.  In June 2017, the court terminated jurisdiction over all four children, granting Mother sole legal and physical custody.

### 3. Ani.S., Ala.S., Amb.S., Abr.S., and Eve.A.

In March 2020, DCFS received a referral alleging Mother went to the house of Eve.A.'s father and vandalized his car.  Mother was alleged to have taken her children with her while lacking car seats for Ani.S., Ala.S., Amb.S., and Abr.S., who still needed them.  The referral claimed "[t]here was an open empty can of alcohol in the mother's vehicle however there is no suspicion that she is under the influence."  The father whose car was vandalized alleged Mother had a history of "meth abuse" but "[i]t was reported that mother was not under the influence of meth at this time."  This referral was found to be substantiated.

In November 2020, the juvenile court sustained a petition (presumably filed due to the substantiated referral discussed in the previous paragraph) as to Ani.S., Ala.S., Amb.S., Abr.S., and Eve.A., finding Mother and a "male companion" (Eve.A.'s father) had "a history of engaging in physical altercations."  The petition described an incident in which Mother engaged in a car chase with Eve.A.'s father; Mother failed to properly secure the children in the car with her, drove erratically, and threw bottles at the

---

[3] The record does not further describe "Stepping Stones."

father's car.[4]  During the pendency of this case, Mother missed three drug tests in September 2021, and a DCFS report noted that, since March 2020, "Mother's drug test records indicated that she sporadically participated in drug testing."  In November 2021, a four-year criminal protective order was issued, protecting Ani.S., Ala.S., Amb.S., and Abr.S. from Mother.  In June 2022, the court sustained a February 2022 section 342 petition filed on behalf of the children, finding Mother had struck the children with a belt, a hanger, a sandal, and her hands, causing pain and bruising.  In June 2022, the court terminated jurisdiction as to Ani.S., Ala.S., Amb.S., and Abr.S., releasing them to their father.  In March 2023, the court terminated jurisdiction as to Eve.A., releasing her to her father.

### 4.    James

In July 2023, San Bernardino County received a referral regarding James (born July 2023), alleging "a positive toxicology test for marijuana at the time of his birth."  Mother "was reported to have tested positive for amphetamines throughout her prenatal care with the last positive test being 6/1/2023."  She also "reportedly tested positive at the time of delivery."  The referral was closed on September 27, 2023, with the disposition "contact attempted, can't locate."

### 5.    Ani.S., Ala.S., Amb.S., and Abr.S.

In January 2024, the court sustained a November 2023 petition DCFS filed on behalf of Ani.S., Ala.S., Amb.S., and Abr.S., alleging their father could not care for them.  Although

---

[4] The court sustained three other counts of the petition containing allegations against Eve.A.'s father and Anthony S.

Mother did not appear to be named in this petition, as part of that case, Mother was ordered to submit to random and on-demand drug testing. In a July 2024 status report, DCFS noted Mother had "failed to comply with the court ordered case plan." A January 2025 status report noted, "Mother appears to be avoiding to drug test [*sic*] for the department." The report stated Mother tested negative once in May 2024, but missed one drug test in March 2024, two tests in April 2024, one test in May 2024, one test in June 2024, three tests in November 2024, and four tests in December 2024.

DCFS reports contain summaries of other referrals relating to Mother—including a July 2018 referral that Mother had used and was using methamphetamines—that were deemed unfounded or inconclusive.

### B.    *DCFS Investigates a Referral*

On January 15, 2025, a Children's Social Worker (CSW) met with James's father at the home of the paternal grandmother (PGM).[5] Father claimed Mother did not live there and would not permit the CSW to enter. Father came outside with James; the CSW observed James seemed comfortable with Father. Father said he had always taken care of James and had custody of him.

On January 27, 2025, DCFS received a referral that Mother was neglecting James. The referral referenced the "open court

---

[5] This CSW was assigned to a case regarding James's "half[-]siblings," and visited Father because she had been speaking with Mother, and Mother "finally provided a name to the person who had her most recent child, James A[]." Using the name, the CSW located an address for Father through public records.

case since 2023," as well as the closed referral regarding James's positive drug test at birth, and alleged Mother had mental health and substance abuse issues.

On January 29, 2025, the CSW assigned to the case regarding James's siblings spoke with Mother, who stated that DCFS had not opened a case regarding James, and Father did not need to answer the CSW's questions. Mother asserted her attorney had advised her she did not need to speak with DCFS about James and could leave town with James. Mother also claimed Father was not James's biological father but admitted she was living with him and they were co-parenting James. When the CSW encouraged Mother to comply with "court orders," Mother asked what the point was, if she could not see her kids. When the CSW "reminded mother of the concerns and how child James tested positive for THC at birth, the mother denied this stating the test from the hospital at such time was wrong." Mother "sounded very upset during the conversation by the sound of her voice as she got louder and louder."

The next day, the CSW assigned to the January 2025 referral visited Father's home. When she asked to speak with Mother, Father stated she left the home "weeks ago" and denied knowing where she was or having an address or phone number for her. When the CSW asked to see James, Father claimed Mother took him. After twice reminding Father he needed to be honest and telling him their interview would be included in a DCFS report, the CSW saw a child trying to open the door behind Father. Father claimed the child was his nephew, not James. When the CSW again asked Father if he was being honest, Father had tears in his eyes, told the CSW to "hold on," and then went back inside the house, returning with James. James was

7

clean, dressed appropriately, and appeared to be bonded with Father. He had no visible marks or bruises and seemed happy.

Father apologized for lying, stating he did not want DCFS to remove James from his care. Father stated he had cared for James since birth. Father denied Mother neglected or was left alone with James. Father said his mother (PGM) was a nurse, and she helped care for James when Father was working. Father had no concerns over Mother's mental health or drug use and stated Mother was "good with" James. Father stated it was difficult for him to obtain custody of James because his name was not on the birth certificate.

Father did not know the last time Mother was in the home; he denied being in a relationship with her. He then ended the interview, saying he did not need to answer any more questions because the CSW had seen James. Father stated he wanted nothing to do with DCFS and refused to permit the CSW to conduct a home assessment.

As the CSW was leaving, PGM ran out of the house to speak with her. PGM apologized on Father's behalf, explaining he was just scared DCFS would take James away from him. PGM assured the CSW that Father took great care of James. When asked about Mother, PGM stated Mother lived in the home until the other social worker came, and then Mother left. PGM denied Father used drugs but said she did not know about Mother. "PGM reported that she has known mother for a very long time and does not know when she is under the influence of drugs," claiming Mother "doesn't act any different when she uses drugs." PGM permitted the CSW to conduct a home assessment; aside from some clutter, the CSW found no issues with the house.

In early February 2025, Mother called the CSW, stating she did not know if Father was James's biological father, and informed the CSW she did not want DCFS to provide information to Father about James. Mother confirmed James was with Father, and that she would speak with DCFS after consulting with her attorney.

In late February, the CSW met with Father at his home. Father reported Mother had seemed sober when she visited with James the day before. The CSW informed Father DCFS would be opening a case for James. When the CSW asked to see James, Father stated he was with a babysitter but refused to provide the babysitter's contact information.

Two days later, the CSW spoke with Mother over the phone. Mother claimed she did not know she was supposed to contact the CSW; the two agreed to meet the next day. Mother expressed her belief that DCFS had been unfair to her, claiming the court had granted a restraining order against her regarding four of her children based on "false allegations reported by their father." Mother asserted she had complied with all court orders until recently, because she now felt like there was no point if she could not see her children. When the CSW stated DCFS had concerns about James, Mother responded it made no sense that DCFS was concerned about James now, when he had been in her care for over a year. The CSW explained that the allegations regarding James testing positive for marijuana at birth had never been investigated, and Mother did not appear to have drug tested for DCFS since April 2024. Mother said she had been living with Father until the first CSW had visited him, and then Father and PGM asked her to leave, fearing her presence would lead to James's removal. Mother claimed that, when the CSW

9

had visited Father's home two days before—when Father said James was with a babysitter—James had been with Mother, visiting a relative in the hospital. She stated Father had lied to the CSW in a misguided attempt to protect Mother.

When the CSW asked Mother if she would drug test, Mother said, "[T]his is what I mean, there is no proof that I have ever used drugs or that I'm using drugs. I was willingly drug and alcohol testing for the department, but there's no reason why, I don't do drugs." However, Mother agreed to drug test the next day, after her meeting with the CSW. But the next day, Mother canceled the meeting with the CSW, claiming a hospitalized relative had died. Mother requested to reschedule the meeting for five days later. The CSW agreed, but Mother did not show up to that meeting. When the CSW next contacted Mother, she claimed she had not received a text confirming the meeting. When the CSW asked if they could meet, Mother refused because it was her birthday; Mother also said she would need to speak with her attorney before speaking to the CSW. Mother confirmed she had moved back in with Father.

### C.   *DCFS Files a Petition*

On March 11, 2025, DCFS obtained a removal order for James. When the CSW visited Father's home the next day to serve the order, Father was upset and explained the maternal aunt had come to the house over the weekend and left with both Mother and James. Father said he had just begun "to start the process to get custody" of James. The CSW saw that the room Father apparently shared with Mother looked "very disheveled as if there had been some sort of fight." PGM told the CSW Father and Mother had argued; before she could say anything else, Father told her to be quiet. The CSW left Mother a voicemail

regarding the removal order and asked Mother to call her back. She also sent Mother a text message "advising of the removal order and asked that she bring [the] child," and advising that "DCFS would need to file a warrant for [the] child as well as an arrest warrant for the mother." Mother did not call or respond to the CSW.

On March 13, 2025, the CSW filed a missing person's report. As part of the Sheriff's investigation into that report, a deputy spoke with Father and noted that "[w]hen Father asked [Mother] where she was going, she refused to tell him." According to the same report, on March 11, Mother texted Father to say that "she would be staying with family in San Francisco, Apple Valley or Hacienda Heights but refused to provide any further details regarding these locations."

On March 13, 2025, DCFS filed a petition with a single count under section 300, subdivision (b)(1). Count b-1 alleged Mother used marijuana when pregnant with James and had "an unresolved history of substance abuse including marijuana," rendering her incapable of caring for James. The count also alleged that Father knew or should have known about Mother's substance abuse and failed to protect James from it.

At the March 14, 2025 detention hearing, the court found Father to be James's presumed father. The court issued an arrest warrant for Mother and a protective custody warrant for James. The court ordered James to be detained from Mother and that, when James was found, he was to be released to Father on the conditions that DCFS provide services and make unannounced visits, and that Father make James available to DCFS, permit DCFS to enter the home, and agree to participate

11

in recommended services. At DCFS's request, the court granted a seven-day stay on the order to release James to Father.

Later that night, the City of Industry Sheriff's Department found James with Mother at a relative's house. Law enforcement detained Mother and released James to DCFS who placed him with a paternal aunt. Three days later, DCFS agreed Father could pick James up and take him home. Mother was charged with "child stealing" and "child custody deprivation" in violation of Penal Code sections 278 and 278.5.

### D.     *Father Seeks a Domestic Violence Restraining Order*

On the same day DCFS filed a petition, Father requested a Domestic Violence Restraining Order against Mother, protecting Father, James, and PGM. In his declaration supporting the request, Father claimed that when he returned home on March 8, 2025, Mother was already present and "punched me in my face two times in front of my son." Mother was "acting crazy and started being physical with [PGM] and damaging [PGM's] property inside her home." Mother "knocked down everything in the kitchen and [was] trying to attack me while my mother was trying to hold her back from harming me any further." Father claimed Mother would "come to my home and smelling like alcohol and being and disturbing [*sic*] my family by yelling and trying to fight." The court granted a temporary restraining order protecting Father and PGM—but not James. The TRO ordered Mother not to contact Father unless it was "brief and peaceful contact . . . to communicate about your children for court-ordered visits."

After an April 2025 preliminary hearing, the court held Mother to answer on the charges of child stealing and child

custody deprivation.  Mother was also served at the hearing with a criminal protective order, requiring her to stay away from and not contact James.

### E.    *DCFS Continues to Investigate*

In April 2025, a dependency investigator (DI) spoke with Father and Mother.

#### 1.    Father

The DI visited Father at his home.  The CSW observed the home to be safe for James, and James to be friendly and happy.  Father said he had "no idea mother would smoke marijuana" because she knew he did not "agree on things like that."

As for when Mother took James, Father explained that, after he arrived home with James on March 8, 2025, Mother was already there, claiming she was waiting for her aunt to come get her.  When the aunt arrived, and Father refused their request to take James out for a couple hours, the aunt "tried to get physical" with Father, and Mother began "knocking down objects at the house."  After Mother left, Father called the police, but with Mother gone, "there was no situation to report anymore."  Mother returned with a different aunt and her mother (the maternal grandmother); the aunt "grabbed" James and they all left.  Father called the police to report a kidnapping but was informed they could not help because Father lacked legal rights to James.

#### 2.    Mother

The DI spoke with Mother, who was in a detention facility.  She claimed, "I never had drug history.  I voluntarily drug tested for DCFS and never was dirty.  I have been drug testing for two years for my prior cases."  She added, "I have complied with

13

Court and with all my drug tests. No, not true regarding using marijuana during pregnancy with son, James. I tested positive for marijuana on one test and clean on another test [that] was conducted by the hospital. Son James was never positive[,] he was clean. I am not sure where all this information came from. It is incorrect. I am going to request all records and prove it. This does not make sense. I did not use marijuana during pregnancy. There was no substance abuse." Mother stated as soon as she was able to leave the detention facility, she would "go straight into a program," although "I am not sure I will get enrolled because I do not have a drug issue."

As for absconding with James, Mother claimed Father "threw me out like a dog" because social workers had told him she should not be around children. The next day, Mother came back with "[m]y MGM and MA" and "we got the baby James, and we left."[6] Additionally, Mother claimed PGM had recently taken her to get a new phone to replace a broken one, so both PGM and Father knew her new phone number, but apparently did not give that number to DCFS or the police. Mother stated she was unaware of any open cases regarding James or any warrants, and claimed she had told Father she was going to her brother's place in San Francisco. She also claimed she could care for James.

---

[6] It is unclear whether Mother is claiming she returned with her own maternal grandmother and aunt (i.e., James's great-grandmother and great-aunt) or James's maternal grandmother and aunt.

14

Mother admitted she called Father "from jail because I wanted to know where my son was."[7]

### F.     *The Court Removes James from Mother*

At the April 2025 adjudication and disposition hearings, Father's counsel informed the court that Father and DCFS had "reached an agreement" and "Father is non[-]offending."

Mother's counsel asked the court to dismiss the petition because there was no evidence of current substance abuse, and no "nexus for Mother's marijuana use and lack of child care"—DCFS reports indicated James was a "happy baby."  Counsel further argued Mother did not "kidnap[]" James because she did not know "there was a warrant out for the baby's detention."

James's counsel expressed concern over Mother's "complete denial about her substance abuse, which has lead [*sic*] to multiple D.C.F.S. cases being open throughout a long period of time with the family."  Counsel contended the current case was "similar to the other cases filed in the past concerning mother's drug use, including usage that caused a number of my client's siblings to be placed with their respective fathers."  Counsel argued that DCFS had been unable to investigate the initial referral about James— that he had tested positive for marijuana at birth—because Mother was "evading" DCFS, and there was no evidence Mother had resolved her substance abuse issues.  DCFS's counsel joined the argument made by James's counsel.

The court amended the petition to strike the allegations regarding Father, and found true allegations that Mother had an

---

[7] A police report later determined Mother had called Father six times in less than two days in violation of the restraining order; Father did not answer the calls.

"unresolved history of substance abuse including marijuana and methamphetamine," which rendered her incapable of providing James with regular care and supervision. The court also found true that, at James's birth, he tested positive for marijuana while Mother tested positive for methamphetamine. The court stated, "Although the positive drug test[s] for James and [Mother] were some time ago, [Mother]'s behavior in her inability to control anger and her continuing to act out against [Father] in a violent manner are evidence of her continuing use of substances." The court removed James from Mother after finding by clear and convincing evidence that there was a substantial danger to James if he were to remain in Mother's custody and no reasonable means to protect him short of removal. The court released James to Father.

Mother timely appealed.

## G.    *Request for Judicial Notice*

In December 2025, DCFS asked we take judicial notice of minute orders reflecting that in October 2025, the court: (1) terminated jurisdiction over James, granting sole legal and physical custody to Father, and granting monitored visits to Mother; and (2) granted a three-year juvenile restraining order, ordering Mother to stay away from and not contact Father, James, or PGM, except for visits or communications about visits. Mother opposes this request, arguing the orders DCFS wants us to notice are irrelevant to this appeal. We agree. Neither party makes any arguments based on these orders, and the orders shed

16

no light on the issues before us in this appeal.[8] We therefore deny DCFS's request.

## DISCUSSION

A child may be adjudged a dependent of the court if he "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] . . . [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) "We review the court's jurisdictional and dispositional findings for substantial evidence." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.)

### A. *Substantial Evidence Supports the Court's Finding That Mother Had an Unresolved Substance Abuse Issue*

In 2016, the juvenile court found true that Mother and Anthony S. placed Ani.S., Ala.S., Amb.S., and Abr.S. at risk because "a drug pipe and methamphetamine residue were found in the children's home, within access to the children and the parents allowed drug use in the home," and there was "a strong odor of marijuana in the home."

In March 2020, DCFS substantiated a referral alleging Mother drove to the house of Eve.A'.s father with an open empty can of alcohol in her car (although she was not suspected to be

---

[8] DCFS has not argued the termination of jurisdiction moots this appeal.

17

under the influence at the time of the incident) to vandalize his car. Eve.A.'s father alleged Mother had a history of "meth abuse."

In July 2023, San Bernardino County received a referral alleging James had tested positive for marijuana at birth, and Mother had tested positive for amphetamines throughout her prenatal care, with the last positive test on June 1, 2023. Although the referral was not investigated because the investigating agency could not locate Mother, when Mother was asked about these results, she insisted they were wrong—thereby acknowledging the tests and the results.

Mother also missed a substantial number of drug tests in other child welfare proceedings. As part of a 2020 case opened against Mother, it was noted she "sporadically participated in drug testing." In a July 2024 status report regarding a case alleged on behalf of Ani.S., Ala.S., Amb.S., and Abr.S., DCFS noted Mother was not complying with the court's case plan, which included drug testing. And in a January 2025 report in the same case, DCFS opined Mother was avoiding drug tests, pointing out 12 missed tests from March 2024 to December 2024. The missed tests can properly be considered positive test results. (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217, [missed drug test "properly considered the equivalent of a positive test result"], disapproved on another ground in *In re N.R.* (2023) 15 Cal.5th 520, 560.)

In applying for a restraining order against Mother, Father declared she would come to his home smelling like alcohol and create a disturbance by "yelling and trying to fight."

Finally, PGM claimed she had known Mother "for a very long time" and could not tell when she was under the influence of

drugs because Mother "doesn't act any different when she uses drugs."

On this record, the court could reasonably conclude Mother had an unresolved history of substance abuse.

**B.** ***Substantial Evidence Supports the Court's Finding That Mother's Substance Abuse Placed James at Substantial Risk of Harm***

"[F]or dependency jurisdiction to exist due to substance abuse pursuant to section 300(b)(1)(D), this abuse must render a parent or guardian unable to provide regular care for a child and either cause the child to suffer serious physical harm or illness or place the child at substantial risk of suffering such harm or illness." (*In re N.R.* (2023) 15 Cal.5th 520, 531.)

Mother claims the court erred in assuming jurisdiction because "there was simply no evidence Mother [was] unable to care for [James] at any time." We disagree.

First, the record shows that caring for James had largely fallen to Father during James's life. While DCFS had the burden to show Mother's substance abuse placed James at risk, the juvenile court could properly consider the lack of evidence that Mother had ever successfully cared for James on her own for a substantial period. The court could also have reasonably taken into account that James's young age at the time of the adjudication hearing—less than two years old—rendered him particularly vulnerable to neglect and abuse.

The court found that Mother's "behavior in her inability to control anger and her continuing to act out against [Father] in a violent manner are evidence of her continuing use of substances." Father averred that, in March 2025, Mother had punched him twice in the face in front of James and was "acting crazy." She

19

was also "being physical with" PGM and damaging her property. Mother "knocked down everything in the kitchen" while trying to attack Father. If Mother was damaging property and knocking things down in James's presence, James was at risk of being injured. And given the court's conclusion that Mother had an unresolved substance abuse issue, the court could also reasonably conclude Mother's violent and destructive behavior was due to her substance abuse.

That James tested positive for marijuana at birth and Mother tested positive during her pregnancy demonstrates Mother was unwilling to curb her drug abuse even when James was in utero and her drug use could have directly harmed him. The court could reasonably infer from this that Mother would be even more unwilling to refrain from drug use now that James had been born. The longer James was alone with Mother, the more likely that he would be exposed to her behavior while she was under the influence.

Mother had already shown she was willing to forcibly remove James from Father's home without letting him know where she was taking him.[9] Even after a CSW left Mother a voicemail and sent a text message regarding the removal order for James, Mother did not return or communicate with DCFS— law enforcement had to find and deliver James to DCFS. By the

---

[9] While Mother claims she told him she was going to her brother's house in San Francisco, Father said she had texted him that "she would be staying with family in San Francisco, Apple Valley or Hacienda Heights but refused to provide any further details regarding these locations." Further, while the record does not disclose the exact location where Mother was found, it does disclose the City of Industry Sheriff's Department found her.

time this happened, James had been in Mother's sole custody for over six days.

On this record, and given Mother's history of disregarding court orders, substantial evidence supports the court's finding that Mother's unresolved substance abuse issue placed James at substantial risk of harm, and there were no reasonable means to ensure his safety short of removing him from Mother's custody.[10]

## DISPOSITION

The court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

[10] Mother's only argument for reversing the dispositional order is that "the jurisdictional findings must be reversed." Because we disagree, we also do not reverse the dispositional order.